767 A.2d 1036

IN THE MATTER OF RUTH CHANDLER, AN
ALLEGED INCAPACITATED PERSON.

Superior Court of New Jersey
Appellate Division

Argued January 10, 2001—Decided March 13, 2001.

Before Judges KING, COBURN and AXELRAD.

*David G. Hardin* argued the cause for appellant Summit Bank (*Cooper, Rose & English,* attorneys; *Joseph E. Imbriaco, Mr. Hardin,* and *Katherine E. Ingrassia,* on the brief).

*Nina E. Weiss* argued the cause for respondent Public Guardian for Elderly Adults, Guardian of Ruth Chandler (*Christine H. O'Donnell,* Public Guardian for Elderly Adults, attorney; *Ms. Weiss,* on the brief).

The opinion of the court was delivered by

AXELRAD, J.T.C. (temporarily assigned).

This is an appeal by Summit Bank (Summit), co-trustee of the revocable trust of Ruth Chandler, an incompetent, of the judge's order authorizing the Office of the Public Guardian for Elderly Adults (Public Guardian) to revoke the trust created by Chandler.

On February 21, 1997 Ruth Chandler, as grantor, created a revocable living trust for her own benefit with Summit as trustee. There was an ongoing relationship between Summit and Ruth

Chandler, as shown by her naming the bank as sole executor under her 1993 will. Ruth Chandler was age seventy-three and had virtually no family. She funded the trust with all of her marketable securities, then valued at about $1.7 million.

Three months later, Ruth Chandler revoked the trust and established a substantially similar one with her friends Charles M. Menagh and Earl Tiffany as trustees. Ruth Chandler expressly provided in the trust agreement for the management of the trust property in the event of her subsequent incapacity. The trust would continue and the trustee would be authorized to make such direct payments "as the Trustee may deem proper to provide for [her] maintenance, support, and comfort in accordance with the standard of living enjoyed by [her] prior to [her] incapacity." Upon her death, the trustee would distribute the remainder of the trust estate to the personal representative of her estate as a part of her estate.

Summit filed a complaint for advice and direction regarding the validity and legal effect of the May revocation. Pursuant to a settlement agreement, on July 9, 1997, with the advice of her personal attorney, Ruth Chandler executed an amendment to the trust, which revoked the designation of Earl Tiffany as co-trustee and designated Summit as corporate co-trustee, and ratified all other terms of the trust. Summit and Menagh administered Ruth Chandler's trust as co-trustees from 1997 to August 1999. In oral argument we were advised that during the pendency of the appeal, Menagh passed away. The present market value of the trust exceeds $2.4 million.

In late 1998 Ruth Chandler's mental and physical condition began to seriously decline. This action commenced with the filing of a verified complaint by Adult Protective Services Program of Senior Services and an order to show cause, resulting from a referral from Summit personnel, seeking adjudication of Ruth Chandler as an incapacitated person, and the appointment of a guardian on her behalf. On December 1, 1998 the judge appointed Catherine B. Liu (Liu) as counsel for Ruth Chandler.

Several interested persons sought appointment as Ruth Chandler's guardian, including Paul Goodman, longtime friend and neighbor; Melanie Menagh, the daughter of Charles Menagh who was a co-trustee and friend; Summit; and the Public Guardian.

After investigating Ruth Chandler's situation and interviewing the various persons interested in becoming Chandler's guardian, on February 18, 1999, Liu submitted a report which recommended that Summit be appointed guardian of Ruth Chandler's person and property. Her report concluded:

> The New Jersey Public Guardian is the guardian of last resort. In this matter, I respectfully submit that as Summit Bank is willing and able to perform all of the duties of a guardian for Ms. Chandler, that it is not necessary to resort to the Office of the Public Guardian. Furthermore, due to the long-standing relationship between Ms. Chandler and Summit Bank, Summit Bank would be able to provide a personal and familiar relationship with Ms. Chandler which the Public Guardian could not. Therefore, although the Public Guardian may be able to administer Ms. Chandler's Trust with a minimum of costs, given the fact that Summit Bank has established a five (5) year relationship with Ms. Chandler, which was of Ms. Chandler's own initiation, it appears it would be in Ms. Chandler's best interests to maintain such a personal relationship. As to the possible issue of the Public Guardian expending less of Ms. Chandler's funds for services as her guardian, I respectfully submit that since Ms. Chandler is in possession of a sizable estate and further since Summit Bank has had a five (5) year personal relationship with Ms. Chandler, the benefits of appointing Summit Bank [as] Ms. Chandler's guardian outweigh any additional costs.

The judge conducted a hearing on February 25, 1999, and heard testimony from several witnesses regarding Ruth Chandler's physical and mental condition. Public Advocate Christine O'Donnell testified as to the structure of her office and her professional staff of social workers, staff attorneys, a trust services unit headed by a former trust officer of a bank, and accountants. The Public Guardian opposed Summit's appointment on the basis that Summit was not as qualified as the Public Guardian in the provision of adult protective services. In response to the inquiry by the judge that, "given the existence of that trust, would [her] office accept the responsibility of being guardian of her person and not her property," Ms. O'Donnell stated, "I would have to decline that responsibility.... We have had some problems with guardianships of the person...."

The judge and the Public Advocate then discussed the potential status of the trust if her office were appointed as guardian of Ruth Chandler's person and property. In response to the judge's question as to whether the trust should "continue or should [he] order it terminated and the assets turned over to [her] office," Ms. O'Donnell stated that she could not give the judge a definitive answer but would take into consideration Ruth Chandler's intent to create such trust and use it to provide for her care. She further indicated that she did not know at that time whether she would be making an application to terminate the trust.

The judge adjudicated Ruth Chandler an incapacitated person and appointed the Public Guardian as guardian of her person and property, "entitled to the reasonable value of services including commissions and fees to be paid solely from [her] estate." Summit does not challenge that portion of the judge's order. The February 25, 1999 order further provided that the guardian "shall have all the powers vested in the Court under *N.J.S.A.* 3B:12–49,[1] and this Judgment will serve as authorization for immediate access and powers over all assets of Ruth Chandler."

Summit, concerned with the implication of the delegation of the court's "3B" powers conferred upon the Public Guardian, filed a motion for reconsideration of the February order on the grounds that the Public Guardian's power to revoke the trust should not be allowed absent express court approval. At oral argument on June 11, 1999 the judge agreed with Summit's argument that the Public Guardian did not have the "automatic right to terminate this trust agreement" by virtue of the delegation of the court's statutory powers under *N.J.S.A.* 3B:12–49. He also ruled that the Public

---

[1] That statute states:

The court has, for the benefit of the ward, his dependents and members of his household, all the powers over his estate and affairs which he could exercise, if present and not under a disability, except the power to make a will, and may confer those powers upon a guardian of his estate. These powers include, but are lot limited to power to convey or release the ward's present and contingent and expectant interests in real and personal property .... to exercise or release his powers as trustee ...

Guardian needed "court permission to terminate the trust agreement in these types of circumstances" because of "all of the care and the forethought to establish the relationship [between Chandler and the trustees] in the first place." Then, without conducting a hearing as to issues such as the competing guardian's fees and investment methods, the court concluded on a "solely economic" basis that Ruth Chandler's estate should not "have to pay commissions to both" the Public Guardian and Summit and authorized the revocation of the *inter vivos* trust. The judge rejected Summit's offer to restructure its trustee's commissions to mitigate the effect of any double commissions. Accordingly, on June 22, 1999, the judge entered an order denying Summit's motion for reconsideration and granted the Public Guardian the authority to revoke the trust.

Pursuant to the court's ruling, the Public Guardian served Summit and Charles Menagh, the co-trustees, with written notice of revocation of the trust by letter dated June 14, 1999. On July 20 Summit filed a motion for a stay of the June order pending appeal. Summit filed a timely notice of appeal on July 27, 1999. On July 28 the trial judge granted a stay until August 4, 1999.

During oral argument on Summit's stay motion, the judge acknowledged that Summit had a right to be heard and present testimony on the issue of termination of the trust, which was never done. He conceded that his June decision authorizing the Public Guardian to terminate the trust was in error. According to the judge:

> The Summit Bank has a right to be heard and to present testimony if it desires to do so as to why the trust should not be terminated by the Court.... [T]he Public Guardian can't do it inherently. They have to get approval from the Court. And, therefore, the Public Guardian, in order to get that, is going to have to establish why that trust should be terminated.
>
> Summit Bank should be given the opportunity to argue to the contrary and to present testimony to the contrary.
>
> ... That set of issues was never heard.
>
> I made the determination, and I think erroneously.

However, based on his "impression ... that Miss Chandler went along with Summit Bank being named as co-trustee, albeit she

didn't want the bank to be named as trustee at all [in settlement of the litigation involving the trust] . . . [which] understanding could be dead wrong," the judge denied Summit's motion for a stay.

On August 4, 1999 we denied Summit's emergent application for a stay pending appeal. On August 5 the majority of the trust assets were transferred by Summit in accordance with the Public Guardian's instructions. Summit retained about $100,000 of the trust assets as a claimed termination fee.

Summit's overriding argument is that the judge erred in authorizing the Public Guardian to revoke the trust on the basis of the inadequate record before him. It argues that the Public Guardian has no inherent authority to revoke a ward's trust, but instead must demonstrate at a factual hearing that the revocation of the trust is necessary. The Public Guardian maintains that it had express authority to revoke the trust and, alternatively, that the judge had already conducted a sufficient factual hearing in February when he adjudicated Ruth Chandler an incapacitated person and appointed the Public Guardian as guardian of her person and property.

█ The judge correctly determined that the Public Guardian did not have, by virtue of its appointment, the inherent right to terminate Ruth Chandler's trust agreement without court approval. There is no case law on the question in New Jersey; however, this ruling is consistent with rulings of courts in other states. *See Friedrich v. BancOhio Nat. Bank*, 14 *Ohio App.*3d 247, 470 *N.E.*2d 467, 472 (1984) ("If an individual who retains such a power of revocation or alteration later becomes incompetent, his guardian does not succeed to the power although it may be exercised by the court for him"); *Weatherly v. Byrd*, 566 *S.W.*2d 292, 293 (Tex.1978) ("[T]he right to revoke a trust, absent an agreement to the contrary, is a purely personal right of the settlor and does not vest in the guardian. . . . [T]he guardian must apply to a court . . . for authorization to revoke the trust"); John D. Hodson, Annotation, *Guardian's Authority, Without Seeking Court Approval, to Exercise Ward's Right to Revoke Trust*, 53 *A.L.R.*4th 1297, 1300

(1987) (The "prevailing" view is a guardian may not revoke a trust without court approval, based on the notion that the right to revoke is a personal right of the ward).

█ We find, however, that the judge, without reference to the relevant statute, abused his discretion by giving the Public Guardian the power to revoke the trust and remove Summit as trustee on the basis of the record before him. A review of the legislative history clearly shows that the Legislature, in enacting the Public Guardian for Elderly Adults Act, *N.J.S.A.* 52:27G–20 to –31, never intended to sanction the conduct now espoused by the Public Guardian. *Senate Bill No.1927,* introduced on June 25, 1984 and amended on October 24, 1984, created in the Executive Branch, the Office of the Public Guardian for Elderly Adults, administratively located in the Department of Community Affairs but independent of departmental control or supervision, and established a public guardianship program for elderly adults at reduced or no cost when appropriate. The head of the office is the Public Guardian, whose status is similar to that of the ombudsman for the institutionalized elderly. According to the *Senate Committee on Aging Statement to Senate, No.1927,* dated October 22, 1984, the purpose of the Office is "to assist individuals who are at least 60 years of age, may be judged by a court [under the provisions of Title 3B of the New Jersey Statutes] to require a guardian or conservator, and [who] have no willing and responsible family members or friends to serve as their guardians or conservators."

█ The theme echoed throughout the Bill and Statements is that the Office of the Public Guardian was established to serve as guardian of last resort, to be invoked only when the private resources, both human and financial, of an elderly person were insufficient to provide suitable protection and care. The Public Guardian can be granted authority over the person, the property, or both, and can be granted partial authority. The Legislature intended that the Public Guardian's powers and role in managing the financial affairs of an elderly ward should be the least intrusive possible with respect to the arrangement established by the

elderly person to manage her finances while she was capable. *See Senate Bill No.1927, supra; Senate Comm. on Aging Statement, supra; Senate Revenue, Fin. and Appropriations Comm. Statement to Senate, No.1927* (January 28, 1985).

This Bill was enacted as the Public Guardian for Elderly Adults Act, *N.J.S.A.* 52:27G–20 to –31; *L.* 1985, *c.* 298, § 1(Act). This Act, as amended, provides for the appointment of the Public Guardian as guardian for an incompetent elderly adult, for the purpose of furnishing guardianship services at reduced or no cost when appropriate in situations where "private guardianship for an incompetent elderly adult may not be feasible where there are no willing and responsible family members or friends to serve as guardian...." *N.J.S.A.* 52:27G–21. According to the Legislature, "this act intends to promote the general welfare by establishing a public guardianship system that permits elderly persons to determinatively participate as fully as possible in all decisions that affect them." *Id.*

After "appointment by a court pursuant to the provisions of Title 3B of the New Jersey Statutes," the Public Guardian may serve "with the same powers and duties of a private guardian or conservator, except as otherwise limited by law or court order." *N.J.S.A.* 52:27G–25g.

The Legislature placed several statutory limitations on the Public Guardian under the Act. The court may grant the Public Guardian "limited powers" if requested by the petition "to the extent it deems appropriate." *N.J.S.A.* 52:27G–26. Most relevant to this case is the express language of *N.J.S.A.* 52:27G–29, which provides,

a. If it is determined that the public guardian should be appointed for a proposed ward, the court shall enter an order that makes findings of fact on the basis of clear, unequivocal, and convincing evidence supporting each grant of authority to the public guardian and that:

(1) establishes whether the public guardian has authority over the person, or the property, or both person and property, of the ward;

(2) Establishes whether, and to what extent, the authority over person or property or both is partial; and

(3) Sets the term of appointment.

b. *No grant of authority to the public guardian will be more than the least restrictive alternative warranted under the facts,* and the public guardian shall employ the form of assistance that least interferes with the capacity of a ward to act in his own behalf.

[<em>N.J.S.A.</em> 52:27G–29 (emphasis added).]

See also *N.J.A.C.* 8:89–11.1(e): "The county adult protective services provider, in petitioning the court for guardianship of a vulnerable adult, shall only seek the specific limited authority needed to protect the vulnerable adult, preserving as much independence as possible."

The judge did not make findings of fact on the basis of clear, unequivocal, and convincing evidence to support his conclusion to appoint the Public Guardian as guardian over Ruth Chandler's person and property and to authorize revocation of the trust established by her. We find it would not serve any purpose to remand the matter for a further hearing, as insufficient evidence has been presented by the Public Guardian to justify revocation of the trust and the removal of Summit as trustee. We find no reason to interfere with Ruth Chandler's choice. We reverse the judge's determination revoking the Chandler trust, without prejudice to the Public Guardian to reapply to the Law Division if subsequent circumstances merit such action based on the relevant legal standards.

In keeping with the spirit of Title 3B and the Public Guardian for Elderly Adults Act, courts and guardians are required to respect the intention expressed by an incapacitated person prior to the onset of incapacity unless the record establishes that a different result is necessary. This record does not support such a necessity. While of sound mind and with the benefit of independent counsel, Ruth Chandler created a private, revocable trust to manage her assets for her own benefit, choosing Mr. Menagh and Summit as her trustees. She was clear in her intent in creating the trust. Ruth Chandler expressly provided in the trust document for the continuing management of the trust property by her designated trustees in the event of her incapacity. She authorized

the trustees to make direct payments of her trust income and corpus to provide for her maintenance, support, and comfort, consistent with the standard of living she previously enjoyed, and to provide for the maintenance of her home. Absent an overriding reason, there is no justification for interference with her choice and revocation of the trust.

The judge gave no consideration to Ruth Chandler's intention to effect private investment management with Summit and made no determination of what would serve her best interests. He never attempted to structure an order that would provide services for Ruth Chandler's personal care and well-being and provide for her financial needs as she directed. At the February hearing the judge gave the Public Advocate carte blanche without considering any less restrictive alternatives. The judge compounded his error at the June hearing. Although the Public Advocate never moved for permission from the court to revoke the trust, the judge turned the Public Guardian's response to Summit's reconsideration motion into a request for revocation. Moreover, when counsel for Summit attempted to address the judge's sole concern that Ruth Chandler's estate would incur double commissions if the trust were to continue, the judge perfunctorily rejected Summit's offer to restructure its trustee's commissions. The record is void of any evidence of improper management or high-risk investments by Summit. To the contrary, as the court summarized at the February 25, 1999 hearing,

> Ms. Liu has investigated the relationship between Ms. Chandler and the bank. It seems to be fine. She has spoken with the personnel in the bank who would be responsible. They appear to be very fine and responsible. They've done an excellent job. And, in her opinion, they will continue to do an excellent job.

Without any basis in fact and in disregard of Ruth Chandler's long-standing relationship with Summit and the bank's past performance, the judge authorized the revocation of Ruth Chandler's trust. In doing so, he inferentially favored the Public Guardian's in-house investment department over Summit and gave the Office of the Public Guardian the opportunity to obtain commissions on a sizable portfolio.

A least restrictive alternative was warranted under the facts. The judge should have appointed the Public Guardian as guardian of Chandler's person and any property not part of the revocable trust, which apparently is a residence and some bank accounts. He should have permitted the revocable trust to remain in place, and directed the trustees to provide sufficient funds to the Public Guardian to provide adequately for Ruth Chandler's welfare and care. The trustees would charge commissions on assets entrusted to them by Ruth Chandler. Moreover, Summit would be responsible to pay the Public Guardian the "reasonable value of all the services rendered by [it], including the costs incurred in the appointment procedure." *N.J.S.A.* 52:27G–27. Chandler's intent in creating the trust would be effectuated, her general welfare would be protected, and commissions would not be doubly imposed. Moreover, the Public Guardian would receive commissions on the assets entrusted to it and would be fairly compensated for all services rendered by it as contemplated by the Act.

At oral argument before us, counsel for Summit confirmed that this alternative would be acceptable to his client. Accordingly, we reverse the judge's decision to revoke Ruth Chandler's trust and direct the Public Guardian to transfer the trust assets to Summit within thirty days. We express no view as to the propriety of Summit's retention of a termination fee, or any other charge by Summit against the trust, as this matter was not before us.

Reversed.